Stuart R. Day, WSB# 5-2244, sday@wpdn.net
Ryan J. Schwartz, WSB# 6-3611, rschwartz@wpdn.net
Ryan L. Ford, WSB# 7-4667, rford@wpdn.net
Alia T. Scott, WSB# 7-5703, ascott@wpdn.net
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
(307) 265-0700
(307) 266-2306 (facsimile)

Steven R. Popofsky, spopofsky@kkwc.com
Pamela A. Frederick, pfrederick@kkwc.com
KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
500 Fifth Avenue
New York, NY 10110
(212) 880-9882
(212) 986-8866 (facsimile)

*Attorneys for Ria R Squared, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| RIA R SQUARED, INC.,<br>a Delaware Corporation, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| WYOMING CATHOLIC COLLEGE,<br>a Wyoming Nonprofit Corporation, | ) | |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT

Plaintiff, Ria R Squared, Inc. ("R Squared"), by and through undersigned counsel, states

and alleges as follows for its *Complaint* against Defendant Wyoming Catholic College (hereinafter

"WCC"), in the above-captioned matter:

## NATURE OF THE ACTION

1.      This case arises from defendant WCC's refusal to return funds to plaintiff R Squared that are rightfully owed to R Squared. Those funds were fraudulently obtained from R Squared by WCC's then-Chief Financial Officer, through his position as CFO and facilitated by WCC and its employees, and were provided by the then-CFO to WCC as a "donation"; i.e., in exchange for no consideration whatsoever.

2.      WCC does not dispute that its then-CFO Paul McCown engaged in a complex, calculated, methodical and fraudulent scheme – including falsifying bank statements and documents and impersonating a Wyoming Community Bank banker – to defraud R Squared out of the sum of $14.7 million, of which he transferred $10 million to WCC as a purported donation.

3.      McCown was able to execute this fraudulent scheme through his role as then-CFO of WCC the help of WCC's Executive Vice President Jonathan Tonkowich, who introduced him to R Squared and received (also for no consideration) $375,000 of the fraudulently-obtained funds (as did another WCC colleague), and the Director of WCC's Business Office, who notarized documents instrumental in McCown's fraud.

4.      WCC also does not dispute that it provided no consideration for the $10 million. Indeed, after becoming convinced of McCown's perfidy, WCC announced, in both a public statement and a message directly from its President, that "**the funds are in the process of being returned**" (emphasis added), as legally required in any event. Most of the $10 million has (fortunately) been seized by the FBI and R Squared hopes and expects to eventually receive those seized funds, but notwithstanding WCC's public commitments and the requirements of the law,

WCC refuses to return even the balance of the funds it received that are rightfully owed to R Squared.

## THE PARTIES

5.       Plaintiff R Squared is a registered Delaware corporation, in good standing, primarily conducting business out of New York City, New York.

6.       Defendant WCC is a registered Wyoming non-profit corporation with its principal place of business located at 306 Main Street in Lander, Fremont County, Wyoming.

## JURISDICTION AND VENUE

7.       Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

8.       The amount in controversy in this matter exceeds the sum of $75,000.00.

9.       Jurisdiction is proper in this District as WCC conducts business in the State of Wyoming, and the underlying facts regarding the fraudulent scheme took place within the State of Wyoming and this Judicial District.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because (i) WCC is incorporated in Wyoming, and (ii) a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE RELEVANT FACTS

### A.       PAUL MCCOWN'S FRAUD ORCHESTRATED THROUGH HIS POSITION AS CFO OF WCC

11.      Upon information and belief, early in 2021 Paul McCown, the then-CFO of WCC, told his employer that he had become extraordinarily wealthy and wished to make a substantial donation to WCC.

12.     In or about February of 2021, McCown signed a Pledge Agreement promising to donate the sum of $20 million to WCC.

13.     That same month, WCC's Executive Vice President Tonkowich introduced McCown, in his capacity as the CFO of WCC, to Emilio Gonzalez, an executive of an investment advisory firm affiliated with plaintiff R Squared and a long-term donor to WCC. McCown and Tonkowich both provided Gonzalez with their WCC business cards at that time, and McCown provided Gonzalez with his WCC email address, Paul.McCown@Wyomingcatholic.edu.

14.     During the introduction, McCown and Tonkowich represented that they were seeking advisory services on behalf of WCC relating to WCC's endowment fund, which they said was about to receive a $10 million donation (from McCown's promised donation, although they did not explain that to Gonzalez at the time).

15.     In March 2021, Gonzalez introduced McCown to David Kang – the Chief Executive Officer of plaintiff R Squared, a global alternative asset manager, and the President of R Squared's affiliated investment advisory firm – in connection with providing advisory services to WCC, and provided Kang with McCown's WCC e-mail address.

16.     Later in March 2021, McCown advised Kang that he had amassed substantial personal wealth and was also seeking investment advisory services on his own behalf.

17.     That same month, McCown provided R Squared with various bank statements purportedly from Wyoming Community Bank in Lander and US Bank in Minneapolis. Those statements purported to show that McCown had hundreds of millions of dollars, including a purported balance of $750,323,282 in his Wyoming Community Bank account.

18.     In the ensuing weeks, R Squared received various documents purportedly executed by Wyoming Community Bank Vice President and Branch Manager Kendall Hayford, from the email address khayford@wyocommunityb.com. Those documents included, among others, a Deposit Account Control Agreement and two "attestation" forms apparently on Wyoming Community Bank letterhead verifying the account balance in McCown's account.

19.     Shortly thereafter, McCown requested that R Squared loan his entity, McCown Enterprises, LLC, $15 million to alleviate a temporary cash-flow issue.  In order to nurture the relationship with WCC and its CFO McCown, and based upon McCown's purported financial documentation, R Squared agreed to loan $15 million to McCown Enterprises.

20.     On May 10, 2021, McCown executed a Promissory Note and Security Agreement on behalf of McCown Enterprises, LLC, both of which documents were notarized by the Director of WCC's Business Office, April Pendleton.

21.     On May 11, 2021, R Squared wired a total of $14.7 million (the $15 million loan amount less an origination fee) in accordance with wire instructions provided by McCown.

22.     Shortly after funding the loan, R Squared learned that the bank statements provided by McCown, as well as the attestations and Deposit Account Control Agreement purportedly signed by Wyoming Community Bank Vice President Hayford, were forged, inaccurate and fraudulent.

23.     The foregoing, all of which is not in dispute, demonstrates that a complex, calculated, methodical and fraudulent scheme was orchestrated and executed by McCown with the assistance of WCC, and to the benefit of WCC, against R Squared.

**B.      WCC'S RECEIPT OF THE $10 MILLION FRAUDULENTLY OBTAINED FROM R SQUARED**

24.      On or about May 11, 2021, McCown transferred the majority of the $14.7 million out of his business's account at Wyoming Community Bank.   Specifically, McCown made numerous transfers, including but not limited to the following, which benefitted WCC and its employees:

a.      McCown transferred $10 million (funneling it through the "Goldman Sachs Philanthropy Fund") as a "donation" to WCC, where he was the CFO.

b.      McCown sent $375,000 to Tonkowich, McCown's colleague at WCC who had introduced WCC and McCown to R Squared's principal.

c.      McCown sent another $375,000 to Susan Gleason, an Admissions Counselor at WCC and McCown's colleague.

25.      WCC gave no consideration for the $10 million "donation" that it received from McCown's fraudulently obtained funds.

**C.      WCC PROMISES TO RETURN THE BALANCE OF THE FRAUDULENTLY-OBTAINED FUNDS NOT SEIZED BY THE FBI, AS LEGALLY REQUIRED IN ANY EVENT**

26.      On June 9, 2021, WCC confirmed to R Squared, through counsel, that it did receive a $10 million "anonymous gift" that WCC "believes . . . was initiated by Paul McCown."  At that time WCC stated that it was "inclined to believe" McCown's denial of any fraud or wrongdoing based on "their years of collegial friendship and awareness of his character," but that it had "voluntarily and unilaterally decided to hold the funds pending completion of its investigation . . ." (Exhibit A).

27.    Shortly thereafter the FBI seized $9,760,845.23 from two of WCC's banks where the proceeds of McCown's $10 million "donation" had been held.

28.    After seizure of the funds referenced above from WCC's banks, WCC maintained possession of $239,154.77 of the $10 million fraudulently obtained by McCown from R Squared and "donated" to WCC without any consideration.

29.    In July 2021, WCC publicly acknowledged that the funds it had received were the proceeds of McCown's fraud upon R Squared, and expressly promised – not once, not twice, but on three separate occasions – that all of the money was going to be returned (as legally required in any event).

30.    Specifically, in a public statement posted to WCC's website on July 7, 2021 (Exhibit B), WCC confirmed that it had received the funds as a result of McCown's "profound breach of trust," and proclaimed that "WCC is cooperating with parties involved in the civil suit, **and the funds are in the process of being returned**" (emphasis added).

31.    To the same effect, on July 8, 2021, WCC circulated an email to a WCC listserv (Exhibit C) again acknowledging that the money received from McCown had "turned out to be the result of a remarkably complex act of fraud," and reporting accordingly that "as of today, the money **is in the process of being returned**" (emphasis added).

32.    And finally, on or about July 14, 2021, WCC confirmed yet again – this time in a phone conversation between its counsel and R Squared's counsel – that WCC intended to return all of the funds obtained as a result of McCown's fraud.

33.    Nonetheless, on or about September 21, 2021, WCC's counsel informed R Squared's counsel that WCC no longer intended to return the remaining $239,154.77 to R Squared.

34.     WCC has in fact failed and refused to return the $239,154.77 that the FBI did not seize from the $10 million it received as a result of McCown's fraudulent activities.

35.     Upon information and belief, WCC does not intend to return those funds to R Squared absent compulsion of the Court.

## COUNT 1 – CONVERSION AND CIVIL THEFT

36.     R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

37.     WCC  is currently exercising dominion over $239,154.77 of R Squared's money that it admits, and could not deny in any event, that it obtained through a fraudulent scheme perpetrated by McCown.

38.     R Squared, through its counsel, has repeatedly demanded the return of the outstanding $239,154.77 from WCC.

39.     WCC has refused to return the outstanding funds to R Squared, thereby denying R Squared the right to use and enjoy that property and impeding R Squared's ability to protect its interests.

40.     By reason of the foregoing, R Squared has been and will continue to be damaged in the amount of $239,154.77 plus interest.

## COUNT 2 - UNIFORM FRAUDULENT TRANSFERS ACT, W.S. § 34-14-205

41.     R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

42.     The Wyoming Uniform Fraudulent Transfer Act, § 34-14-205 ("Transfers fraudulent as to present and future creditors"), provides as follows:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (i) With actual intent to hinder, delay or defraud any creditor of the debtor; or

    (ii) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

        (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        (B) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

43.     On or about May 11, 2021, McCown fraudulently obtained $14.7 million from R Squared.

44.     On or about May 12, 2021, McCown, with the intent to hinder, delay or defraud R Squared, transferred $10 million of the $14.7 million to WCC as an "anonymous" donation.

45.     WCC gave no consideration for the $10 million that it received from McCown.

46.     At the time McCown sent $10 million to WCC, his remaining assets, if any, were unreasonably small in relation to the $10 million transferred, and he knew or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

47.     By reason of the foregoing, the $10 million transfer from McCown to WCC is voidable under the Wyoming Uniform Fraudulent Transfer Act and R Squared was, and continues to be, damaged as a result thereof.

48.     WCC's liability for damages to R Squared arising out of the Wyoming Fraudulent Transfer Act is presently in the amount of $10 million plus interest, and the Court's award should be in that amount. While R Squared believes that the funds seized from WCC by the FBI (as well as other proceeds of the fraudulently-obtained $14.7 million transferred elsewhere by McCown)

will be turned over to R Squared if McCown is convicted as a result of the government's investigation of his fraudulent activities described above, there can be no assurance that R Squared will receive those funds, or when that might happen if it does happen. Should R Squared receive from the United States government any or all of the $9,760,845.23 seized from WCC, of course that will be credited against damages owed to R Squared by WCC, or will be returned to WCC, as plaintiff is not seeking double recovery of the $10 million fraudulently obtained by McCown and transferred by him to WCC without consideration.

## COUNT 3 – NEGLIGENCE – VICARIOUS LIABILITY

49.     R Squared hereby repeats, re-alleges and incorporates by reference the allegations contained in the paragraphs above.

50.     WCC employed McCown, and currently employs Tonkowich and Pendleton, and has or had, at all times relevant, direct supervision over their day to day actions and tasks with regard to their employment at WCC.

51.     As the CFO of WCC, McCown was hired to manage WCC's finances, and WCC expected McCown to do so, including seeking advisory services and funding for the WCC endowment fund.

52.     McCown, through his position as CFO of WCC, with the assistance of WCC employees Tonkowich and Pendleton and acting within the scope of his employment, fraudulently obtained funds from R Squared to benefit WCC with a donation.

53.     WCC has ratified McCown's misconduct by refusing to return the balance of the funds that it received through his fraudulent transaction.

54. By reason of the foregoing, R Squared has been, and will continue to be, damaged in an amount to be determined at trial.

## CONCLUSION

**WHEREFORE**, Plaintiff Ria R Squared, Inc. respectfully prays for judgment and damages against Defendant Wyoming Catholic College for a sum to be proven at trial that is just, fair, and reasonable, and for Plaintiff's costs and for any other such relief as the Court deems just and proper as may further the interests of equity and justice.

**RESPECTFULLY SUBMITTED this 6th day of December, 2021**

/s/

Stuart R. Day, WSB# 5-2244
Ryan J. Schwartz, WSB# 6-3611
Ryan L. Ford, WSB# 7-4667
Alia T. Scott, WSB# 7-7503
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
(307) 265-0700
(307) 266-2306 (facsimile)
sday@wpdn.net
rschwartz@wpdn.net
rford@wpdn.net
ascott@wpdn.net

Steven R. Popofsky
Pamela A. Frederick
KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
500 Fifth Avenue
New York, NY 10110
(212) 880-9882
(212) 986-8866 (facsimile)
spopofsky@kkwc.com
pfrederick@kkwc.com

# Exhibit A

.



**Bradley T. Cave**
**Partner**
**Phone** 307.778.4210
bcave@hollandhart.com

June 9, 2021

Via Email Only:  spopofsky@kkwc.com
Steven R. Popofsky
Partner
Kleinberg, Kapan, Wolff & Cohen, P.C.
500 Fifth Avenue
New York, NY  10110

           RE:  Wyoming Catholic College

Mr. Popofsky:

As you know, this firm represents Wyoming Catholic College with respect to the allegations of fraud generally described in your letter of June 3, 2021 and the demands of your email dated June 9, 2021.

The College acknowledges it received a gift which was designated as anonymous in the amount of $10 million (not $10.5 million) from the Goldman Sachs Philanthropy Fund, and it believes the gift was initiated by Paul McCown.

Your June 9 email makes a series of demands with which the College must comply before you will provide information and documentation to support your allegations.  However, your June 3 letter raises far more questions than answers, and certainly fails to provide the College with any specific information to question the College's good faith ownership of the gift or to compel a conclusion that the College should take action to restrict its use of the gift.  Further, Mr. McCown vehemently denies any fraud or other wrongdoing of the kind described in your letter, and the leadership of the College is inclined to believe him based on their years of collegial friendship and awareness of his character.

The College is not willing to agree to your demands as a condition precedent to your obligation to provide information and documentation.  It is nonsensical to suggest that the College should agree to an indefinite hold on the use of its funds based solely on bare allegations your client has made, and do so based on your vague suggestion that, in return for the College's acceptance of your demands, your client will provide whatever information and documents it chooses to provide on a schedule it determines.  Your client needs to be far more forthcoming with information on a prompt, voluntary and non-coercive basis. Reason suggests that if the supporting evidence is as strong as the tenor of your allegations, your client should be happy to immediately provide the information necessary to persuade the College of the truth of the allegations.

T 307.778.4200   F 307.778.8175
2515 Warren Avenue, Suite 450, Cheyenne, WY 82001
Mail to:  P.O. Box 1347, Cheyenne, WY 82003-1347
www.hollandhart.com

Alaska          Montana          Utah
Colorado      Nevada           Washington, D.C.
Idaho            New Mexico     Wyoming



Steven R. Popofsky
June 9, 2021
Page 2

The College requests all information or documents which you or your client believe supports the allegations that Mr. McCown fraudulently or unlawfully obtained the money he gifted to the College. My review of your letter suggests the following pertinent questions and topics:

- You state that Mr. McCown in his capacity of the CFO of the College stated his intention to seek investment advisory services related to the College's endowment. Please provide any communication in which such an intention is stated.

- Please provide all documents signed by Mr. McCown or your client relating to the $15 million loan, and documents provided by Mr. McCown described in the second paragraph of your letter. Since these documents appear to be the representations that allegedly caused your client to loan money to Mr. McCown, please produce any evidence showing the transmission or delivery of these documents by Mr. McCown to your client.

- The College would like to speak directly to the Vice President of Wyoming Community Bank referred to in the third paragraph. Please provide his name.

- In the third paragraph of your letter, you refer to circumstances indicating that Mr. McCown had access to an illegitimate bank email address. Please provide more information about the circumstances you refer to indicating that Mr. McCown had access to that email address.

- You reference "various documents" signed by Mr. McCown and purportedly notarized by employees of the College. Please provide those documents, and, if your clients have also executed those documents, please provide fully executed copies.

- The letter references unspecified additional documents that appear to have been forged, presumably by Mr. McCown. Please provide those documents and explain why you believe those documents are forgeries.

- Please provide documents and information regarding the identity of individuals who received funds from the $15 million loan, and any documentation of receipt.

- To the extent you or your clients believe the College has any involvement in the allegations of your letter beyond receipt of the gift and the employment of Mr. McCown, please specify the involvement and the evidence supporting the assertion.

Mr. Popofsky, the College is dedicated to searching for truth in all things, including the allegations about Mr. McCown's conduct. Obviously, the College cannot employ a chief financial officer who has committed fraud or misconduct of the kind alleged in your letter. The College hopes that the information you provide will be clear and convincing. In the meantime, the College has voluntarily and unilaterally decided to hold the funds pending completion of its



Steven R. Popofsky
June 9, 2021
Page 3

investigation, or its determination that your client does not intend to promptly, fully and fairly provide information and documentation to support its allegations.

Please do not hesitate to contact me if you have any questions.  We can arrange for secure file transfer when you are prepared to send documents for the College's review.

Thank you for your time and attention.

Sincerely,

Bradley T. Cave
Partner
of Holland & Hart LLP

# Exhibit B



# Statement Regarding Mr. Paul McCown

**POSTED ON JULY 7, 2021 IN NEWS (HTTPS://WYOMINGCATHOLIC.EDU/CATEGORY/NEWS/)**

On June 3, Wyoming Catholic College was made aware of personal financial irregularities involving Mr. Paul McCown, WCC's then-Chief Financial Officer. On June 5, McCown, who had been employed by WCC since May 2018, was placed on indefinite administrative leave.

On June 22, Wyoming Catholic College learned of a federal civil suit filed in the United States District Court for the District of Wyoming, alleging that McCown—without the knowledge of the College—fraudulently obtained a substantial sum of money through alleged illicit transactions. Some of those funds were donated by McCown to Wyoming Catholic College. WCC is cooperating with parties involved in the civil suit, and the funds are in the process of being returned.

On June 25 McCown resigned as CFO. A second WCC employee referenced in the suit has been placed on administrative leave.

Over the past month, to experience such a profound breach of trust by a leader of our institution, has been both embarrassing and painful for Wyoming Catholic College. However, an initial internal review by the College found no additional financial irregularities, and Wyoming Catholic College has neither been sued nor is a defendant to the suit.

<table>
<tr><td>**f** SHARE</td><td>**🐦** TWEET</td></tr>
</table>

# *Related College News*



(https://wyomingcatholic.edu/graduation2021/)

WCC Graduates Celebrated; Encouraged to Embrace Challenges with Gratitude and Hope »

(https://wyomingcatholic.edu/graduation2021/)
NEWS
(HTTPS://WYOMINGCATHOLIC.EDU/CATEGORY/NEWS/)



(https://wyomingcatholic.edu/remembering-chuck-guschewsky/)

Remembering Chuck Guschewsky, Long-Time Friend and Board Member of Wyoming Catholic College »

(https://wyomingcatholic.edu/remembering-chuck-guschewsky/)
NEWS
(HTTPS://WYOMINGCATHOLIC.EDU/CATEGORY/NEWS/)



(https://wyomingcatholic.edu/hanssen-
lecture/)

Dr. Susan Hanssen to Deliver Final
Lecture of Annual Lecture Series on
May 14th »

(https://wyomingcatholic.edu/hanssen-
lecture/)
NEWS
(HTTPS://WYOMINGCATHOLIC.EDU/CATEGORY/NEWS/)

Wyoming Catholic College
306 Main Street, Lander, WY  82520
P: 877.332.2930 F: 307.332.2918

▶️ (http://www.youtube.com/WyomingCatholicClips)  f

(http://www.facebook.com/pages/Lander-WY/Wyoming-Catholic-College/113051475408868)

📷 (https://www.instagram.com/wyomingcatholiccollege/)

CONTACT US   (/contact/)   APPLY NOW   (/admissions/apply/)

# Exhibit C



**From:** "Dr. Glenn C. Arbery" <president@wyomingcatholic.edu>
**Date:** July 8, 2021 at 6:10:05 PM EDT
**To:** etgonzalez@aol.com
**Subject: The Tar of Fraud**
**Reply-To:** president@wyomingcatholic.edu

1





"Things are not what they seem"—that's an old story in the history of all civilizations and cultures. Wyoming Catholic College has felt the truth of that sentiment strike home recently. But we have also had occasion to remember Julian of Norwich as quoted by T.S. Eliot: "And all shall be well and all manner of thing shall be well."

Glenn C. Arbery, Ph.D.
*President*

---

# The Tar of Fraud

Last week, I wrote about Dante's *Inferno*, and this week I need to be more specific. For the past month, the plans of Wyoming Catholic College for a major building project we were undertaking have been cast into uncertainty. On June 3, the largest single gift in the College's history, received in May, was alleged to have been fraudulently obtained through part of a $15 million loan to our then-Chief Financial Officer, Paul McCown. Stunned by this allegation, we placed Mr. McCown on administrative leave and retained counsel for the College. On June 22, a civil lawsuit against Mr. McCown was filed in the U.S. District Court for the District of Wyoming. On June 25, Mr. McCown resigned.

This complicated story broke today in the *Casper Star-Tribune*. We had already posted a statement on our website, which is as detailed as it can be in the circumstances of the ongoing investigation. Many people, by no means exclusively those of us at WCC, have been deeply hurt, both personally and professionally, by the fraudulent activity allegedly committed by Mr. McCown. As of today, the money

is in the process of being returned, and we have revised our plans to begin the renovation of the Baldwin building—a project that had generated great excitement in our community and the city of Lander, and was slated to begin as early as next month. We had already incurred expenses, especially for architectural plans, but—thanks be to God—we had not yet committed ourselves to a construction project.

I want to emphasize that the real effect of the gift was to make us believe that we were capable of acting more quickly to begin the next phase of the college's future than is in fact the case. Although the gift itself turned out to be the result of a remarkably complex act of fraud, our plans for the college are sound, and our hope is by no means destroyed—merely delayed. Despite literally having money in the bank, we had not yet incurred expenses that would endanger the operations of the college, which this summer attracted its largest-ever PEAK enrollment of high school students (three sessions), and which welcomes its largest-ever freshman class in three weeks. We are confident that Wyoming Catholic College will be stronger for having shaken off this false hope and having addressed this threat to our unique mission. Who is not stronger for knowing the truth?

In the meantime, however, I am made more aware than ever of the nature of false gifts revealed in the great books of our curriculum. In the *Aeneid*, for example, Aeneas tells Dido the story of Sinon, who presents himself to the Trojans (after the Greek had supposedly sailed away) as a hated and much-abused escapee from the Greek camp. Aided by deceitful gods, Sinon convinces the pious Trojans that the great Trojan Horse so conspicuously left behind was dedicated to Athena and that it would guarantee perpetual safety to Troy if they took it into their city. The Greeks made it too big, he tells them, for them to get it inside Troy. The Trojans break open the gates to accommodate it. Their very piety and their desire for the good of their city subject them to what follows.

Well, we have not torn down anything to take in this false gift, thank God. Instead, staff and faculty at Wyoming Catholic College are meeting every day in the hallway outside my office to pray the Divine Mercy chaplet and the St. Michael prayer, because WCC is under attack by the Adversary, the enemy of all good. We are dealing with his tar. In Dante's *Inferno*, the Fifth Bolgia of the Eighth Circle punishes the sin of barratry. As one commentator puts it, "*Barratteria* is a medieval term no longer in use, which signifies fraud committed to obtain illicit gain to the detriment of one's community… For Dante, *barratteria* is the corruption of the state as simony is the corruption of the Church." The punitive form of this particular pocket of hell is bubbling tar, the kind shipwrights use to make their vessels watertight—the opposite of what these grafters have been doing with their fraud, which is making the common good of the community leak away. But the image of tar works another way as well. Fraud is sticky stuff. Even being in proximity to it can tar someone with suspicion. We will do all we can to keep that from happening in our community.

In the next pocket of the *Inferno* after the barrators, by the way, come the hypocrites. I'll switch poets for a description of this sin. In *Paradise Lost*, Milton writes that "neither Man nor Angel can discern/Hypocrisy, the only evil that walks/Invisible, except to God alone." How easy it is to think that others should have seen through fraud and hypocrisy—Church officials, for example, in cases of sexual abuse or embezzlement. But let us judge not, lest we be judged. God sees what we do not, and we trust in His Mercy.

**Wyoming Catholic College forms students through a rigorous immersion in the primary sources of the classical liberal arts tradition, the grandeur of the mountain wilderness, and the spiritual heritage of the Catholic Church. Grounded in real experience and thoughtful reflection, our graduates love truth, think clearly, and communicate eloquently, engaging with the world as it is. We remain committed to this vital mission, even in these strange times of pandemic and civil unrest. If you are able, please consider**

making a tax-deductible gift in support of our extraordinary educational vision, ensuring that the College can continue to shape the leaders our country and society so desperately needs.



**Manage Your Subscription**

This message was sent to **ETGonzalez@aol.com** from **president@wyomingcatholic.edu**

Dr. Glenn C. Arbery
Wyoming Catholic College
306 Main Street
Lander, WY 82520

